1

2                                                           Honorable David G. Estudillo

3

4

5                    **UNITED STATES DISTRICT COURT FOR THE**
                         **WESTERN DISTRICT OF WASHINGTON**
6                                       **AT TACOMA**

7

8    UNITED STATES OF AMERICA,
                                                    NO. CR23-5085-DGE-16
9                                  Plaintiff,
                                                    DEFENSE SENTENCING
10   vs.                                            MEMORANDUM

11   SHAWN VINCENT ELLIS,                                   Sentencing Date: 2/20/2025

12
                                   Defendant.
13

14

15          COMES NOW, the above-named Defendant, MR. SHAWN VINCENT ELLIS, by and through

16
     attorney of record, MICHAEL AUSTIN STEWART, and respectfully submits this memorandum
17
     addressing sentencing issues and the Defense's sentencing recommendation in this case.
18

19

20                              I.      **INTRODUCTION**
21
            The Defendant entered into a Plea Agreement where he pled guilty to in Count 1, 21 U.S.C
22
     §§846, 841(a)(1), and 841(b)(1)(B), Conspiracy to Distribute Controlled Substances, and Count 2, 18
23
24   U.S.C. §924(c)(1)(A)(i), Possession of a Firearm in Furtherance of a Drug Trafficking Crime. There are

25   five-year consecutive minimums for each count.  United States Probation is recommending a total

26
     sentence of 144 months.
27

28

     DEFENSE SENTENCING MEMORANDUM
                                                              **MICHAEL AUSTIN STEWART**
                                                                   **Attorney at Law, PLLC**
     Page 1 of 15                                                  1105 Tacoma Avenue South
                                                                  Tacoma, Washington 98402
                                                                  Telephone: (253) 383-5346
                                                                     Fax: (253) 572-9010
                                                                  StewartLawTacoma@gmail.com

## II.    DEFENSE RECOMMENDATION AND BASIS

The Defendant, Shawn Ellis, herein referred to as Mr. Ellis, age 32, is requesting a total sentence of 132 months. This sentence would fulfill the sentencing goals of 18 U.S.C. § 3553 (a) without being greater than necessary and is in-line with similarly situated coconspirators.

Mr. Ellis has a criminal history that includes a number of drug related misdemeanors and nonviolent drug related felonies.

On April 24, 2019, Mr. Ellis received a Drug Offender Sentencing Alternative sentence, which is for nonviolent and low-level felony drug offenses, for possession with intent to deliver charges that were the result of incidental contacts with law enforcement, not investigations into narcotics trafficking.

Mr. Ellis was sentenced on the same day for both drug cases under RCW 9.94A.660 (hereinafter DOSA) which routes nonviolent low-level felony drug offenders through a shortened prison stay and into mandated treatment.

Mr. Ellis successfully completed his DOSA sentence. It was during his time on supervision that Mr. Ellis achieved the happiest period of his mostly unhappy life.  While under supervision from the DOC, he worked 58 hours a week and was clean and sober. He had a good place to live. Transportation. A girlfriend. He developed reciprocal friendships with normal working people. Life was good.

The formula of sobriety and hard work was paying dividends. Good intentions and will power succeeded within the structure that active probation provided. Support from his dual-diagnosis treatment helped him to remain sober and work though issues that arose through everyday life with guidance and peer feedback.

Graduating from the DOSA program felt like launching into a new life.  But without those twin structures of accountability and support Mr. Ellis relapsed. That post-supervision/post-treatment relapse and its inevitable decline resulted in the case before us today.

DEFENSE SENTENCING MEMORANDUM

Page 2 of 15

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

In addition to myriad conditions, Probation rightfully recommends mental health treatment. The Defense agrees and hopes that Mr. Ellis receives a mental health evaluation and treatment plan. The indications of longstanding grief, depression, anxiety, ADHD, and trauma from a childhood with a ACES score of 8 are glaringly obvious.

Society and Mr. Ellis could greatly benefit from the recommendations of Probation and a lengthy and active supervision.

### III.    SENTENCING FACTORS AS APPLIED TO THE DEFENDANT

Title 18, United States Code, Section 3553(a), provides as follows:

(a) Factors to Be Considered in Imposing a Sentence. — The court shall impose a sentence sufficient to, but not greater than necessary, to comply with the purposes set forth is paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
  (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
  (2) The need for the sentence imposed—
    (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) To afford adequate deterrence to criminal conduct;
    (C) To protect the public from further crimes of the defendant; and
    (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court is to also consider the kinds of sentences available, the Sentencing Guidelines range and policy, the need for restitution to victims, and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553 (a) (3-7)

### 1.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Ellis fully admits that his role in this case consisted of redistributing drugs and that he possessed a firearm in order to protect the narcotics and himself from others inside the drug trade. The

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

facts stated by the government about his actions and the recitation of the facts in the Presentence Investigative Report accurately describe Mr. Ellis' conduct in this case.

In terms of the overall DTO, conspiracy, and leadership structure, Mr. Ellis places near the bottom. In terms of who was caught with what on the day warrants were served, Mr. Ellis stands out. On any other day, before the narcotics were transferred to him, it would have been in another's possession inside that organization. It does not change the base level offense nor make a difference for scoring purposes, but it will be highlighted by the United States. It distorts his known role.

### (a.) **Mr. Ellis is not a part of the majority of conspiracy**

It should be noted at the outset that Mr. Ellis only worked with one person who was involved in this criminal enterprise. He was not connected to any other codefendant as it involved narcotics transactions.

In this way, the nature and circumstances of his offense are relatively unique.

Mr. Ellis is not in a gang, has never been in a gang, and does not want to be in a gang. Prison gangs are designed to prey upon people like Mr. Ellis.

### (b.) **Mr. Ellis has had his own struggles with substance abuse**

Drug use has devastating effects on individuals, their families, and their communities. Mr. Ellis recognizes these effects through his own struggles with substance abuse. The vast majority of criminal convictions and law enforcement contacts with Mr. Ellis are low-level drug-related offenses largely associated with unhoused and addicted populations.

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

## 2. MR. ELLIS' HISTORY AND CHARACTERISTICS

### (a.) The Defendant was exposed to physical and mental abuse from family members.

Shawn Vincent Ellis was born in Kent, Washington to John and Tracy Ellis, herein referred to as Mr. John Ellis and Mrs. Ellis. It was a childhood nobody would wish for. Mr. John Ellis was a miserable and abusive husband and father. Mrs. Ellis was a drug addict who was mostly absent and then died when Mr. Ellis was nine years old. Mr. Ellis has not spoken to his father in years after Mr. John Ellis shunned his family for a woman from Thailand he had met online.

Mr. Ellis tried at school, showed some glimmer of hope, but mostly just struggled terribly with grief, abuse, and neglect. The four children of the unhappy marriage have had mixed outcomes in life. Mr. Ellis has also had mixed results, with his best life being lived under supervision. If given lengthy and structured release supervision, Mr. Ellis will likely do well.

Growing up in Auburn, on the outside, it may have looked like the family had many of the trappings of a middle-class life. On the inside, it was a living hell.

Mr. John Ellis worked as a financial aid officer at Art Institute of Seattle until 2010 or 2011. Mrs. Ellis did not work outside the home. Mr. Ellis and his twin sister, Megan, herein referred to as Ms. Ellis, are the middle children. There is an older sister, Stephanie, herein referred to as Ms. Stephanie Ellis, and a younger brother, Noah, herein referred to as Mr. Noah Ellis.

Ms. Ellis and her young son live in Federal Way, where Ms. Ellis works as a teacher at Rainier View Elementary School. Ms. Stephanie Ellis and Mr. Noah Ellis live with their uncle.

Mr. Ellis has "blanked out" much of his childhood. He does not want to remember it. He does not like to talk about it. When inquired, Mr. Ellis suggested speaking with Ms. Ellis.

Ms. Ellis was able to provide important details about the Ellis household while she and Mr. Ellis were growing up.

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

Mrs. Ellis was significantly overweight and diabetic. Mrs. Ellis also struggled with drug addiction that she tried to hide from her family. What the children did know was that while she was alive, their mother was either not at home or sleeping. She was unavailable as a mother.

The Ellis family did not get along. Ms. Ellis stated, "My father hated my mother." Neither Mrs. Ellis nor Mr. John Ellis were good caretakers for their children. Both Ms. Ellis and Mr. Ellis relayed that their father's parents were the essential presence in their lives. Their grandparents lived "next door" which was on a larger three-acre piece of property.

Their grandmother provided the bulk of their care throughout their childhoods. Ms. Ellis believes her grandparents' marriage was also not a happy one and that her father was raised with corporal punishment as well. After her grandfather died, Ms. Ellis stated that her grandmother said to her, "I am so happy to be free of that man."

Mr. Ellis and Ms. Ellis both endorse that they grew up in a physically and emotionally abusive home. As Ms. Ellis stated, "My dad was not a nice man." Ms. Ellis has been diagnosed with ADHD as an adult; she is Mr. Ellis 's twin and he exhibits similar symptoms.

Mr. Ellis had never received a formal ADHD diagnosis as a child because his parents never took him to see doctors. In some cases, children with undiagnosed ADHD may be disciplined excessively because of behavioral issues over which they have no control. Mr. Ellis stated his father would often "lose his shit." Mr. John Ellis would always yell if he did not like something they were doing, and if he got mad enough, which was often, he would use the belt on them.

Ms. Stephanie Ellis, Mr. Ellis, and Ms. Ellis were all beaten by their father with his belt countless times during their childhood. Sometimes Mr. John Ellis would remove his belt and hit it next to the children as a warning. Ms. Ellis has stated that to this day she is triggered by the sound of a belt being

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

removed from pants. Ms. Ellis said that Ms. Stephanie Ellis got the worst of the punishment, being beaten by both parents. Mr. Noah Ellis, who has been diagnosed with Autism, was treated better.

Ms. Ellis said her father gave her a black eye when he hit her openhanded on the back of the head so hard, her face slammed into the counter. On another occasion, Mr. John Ellis dropped Ms. Ellis off of his lap next to a coffee table, she cut her chin and had it stitched up. Ms. Ellis believes that her father did not intentionally cause this injury, but that he just did not care. CPS was contacted about that incident.

Mr. Ellis wished not to recount specific instances of physical abuse. He will nod his head and become quiet when asked about it. Prison, where weakness is preyed upon, may not be a conducive setting to explore events which drag dark memories to light. He often defers to Ms. Ellis to talk about that. He becomes quiet. He says that he doesn't like to think about it, that he won't use it as an excuse for his actions. **"Nobody got me here but me."**

Mr. Ellis did relate parental medical neglect. When Mr. Ellis was nine years old, after his mother passed, he was playing under the house, stood up, hit his head on a metal pipe and started bleeding. He crawled out from under the house, went to his father and was told to "go wash it off" until he stopped bleeding. Mr. Ellis does not know if he hit his head hard enough to be concussed or if he needed stitches, but he was not examined by medical personnel.

When Mr. Ellis was 18 but still living at home, he was cutting a zip tie with a knife and accidentally stabbed himself in his left hand. This incident occurred on Christmas Eve. His father agreed to call the ambulance but made Mr. Ellis wait outside in the cold. An hour and a half later, the ambulance still had not arrived when Mr. Ellis had to remind his father to call. The ambulance finally came, the medical personnel wrapped his wound and his father took him to the hospital where he received stitches. This wound is still visible on this left hand.

DEFENSE SENTENCING MEMORANDUM

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

According to Ms. Ellis, when Mr. Ellis and Ms. Ellis were in fourth grade and nine years old, Mrs. Ellis, their mother, was with friends when a substance placed in her drink caused her to become unconscious. Mrs. Ellis' friends left her where she passed out and did not call for help. After Mrs. Ellis was missing from home for a few days, Mr. John Ellis managed to find Mrs. Ellis, who was still unconscious. Ms. Ellis stated that Mrs. Ellis was hospitalized for a long time. Because of her weight, Diabetes and the length of her hospital stay, Mrs. Ellis developed bed sores. Ms. Ellis states that the bed sores were not treated properly, and as a result Mrs. Ellis developed sepsis and died.

Ms. Ellis does not believe Mr. Ellis was ever told the entire circumstances of their mother's final illness and death. Mr. Ellis, who says merely that his mother died of "some kind of infection," confirmed that he had not known the story of how his mother died until he read his draft biography.

Prior to their mother's death, Ms. Ellis said, there were a few positive memories. The family took a couple of vacations. After Mrs. Ellis' death, there were no positive memories, only abuse, neglect, and eventual estrangement. Mr. Ellis said that after his mother's death, Mr. John Ellis, who was easily triggered and quick to the belt, "was now angry all the time."

Mr. John Ellis, according to Ms. Ellis and Mr. Ellis, would go to work, return home, go directly to his office and close the door. The children were not allowed to enter the office. Ms. Ellis has stated that Mr. John Ellis has blamed their mother for all of his problems to the present day.

Mr. John Ellis abandoned all care of the children, and their grandmother took over what she could. Ms. Ellis stated that their grandmother made sure the children ate, had clean clothes and that the house was clean. She woke the children up for school and made sure they returned home. But she was not a parent to them.

Mr. Ellis felt alone after his mother died and that he raised himself. Mr. Ellis stated that "Gramma made sure I got up on time for school and was home on time."

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

Mr. Ellis and Ms. Ellis attended Scenic Hill Elementary School, Matson Middle School, Mill Creek Middle School and Kent Meridian High School.  Mr. Ellis had a very difficult time in school.

Obesity appears to run in the Ellis family. Mr. Ellis, who is 6'2", weighed 350 pounds in high school. He was bullied consistently throughout his entire public-school attendance. Ms. Ellis stated that Mr. Ellis and she did what many overweight children do – they wore long sleeves and jackets all four seasons, attempting to cover up the bodies they were so ashamed of.

Mr. Ellis never got into fights with his bullies. Mr. Ellis never asked for help from school authorities or talked with guidance counselors or to his grandparents about the bullying. Mr. Ellis stated, "I went to school every day, I endured, and I graduated." Mr. Ellis said he was not college material and always wanted to work with his hands. Prior to graduation in 2010, he got a job at Protective Coatings, a metal finishing company located in Kent.

Just prior to Ms. Ellis and Mr. Ellis graduating from high school, Mr. John Ellis married Manchu, a woman from Thailand he had begun dating through an online website when Ms. Ellis and Mr. Ellis were still attending middle school.

Shortly after their graduation, Mr. John Ellis began a systematic plan to get the children from his first marriage to leave the family home.  First, John evicted Mr. Ellis from the house for what Ms. Ellis believes was a minor infraction.  In actuality, his father kicked him out because he needed Mr. Ellis' bedroom for Manchu's parents.  While Ms. Ellis was not asked to leave the house, Mr. John Ellis made her life miserable until she did.

Both Ms. Stephanie Ellis and Mr. Noah Ellis ended up living with Mr. John Ellis' brother, Stephen Ellis, and remain there today. Mr. Ellis has never spoken to his father since the day Mr. John Ellis evicted him from the family home in 2010.

DEFENSE SENTENCING MEMORANDUM

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

1

### (b.) The Defendant experienced continued hardships into adulthood.

2
3     After leaving home, Mr. Ellis lived in his vehicle before moving into an apartment with a

4     Protective Coatings co-worker. One day Mr. Ellis came home from work to find that the co-worker had

5     moved out without notice, leaving Mr. Ellis responsible for all the bills. At that time, Mr. Ellis was the

6     victim of a violent crime.  He was robbed, beaten, and hit in the head with a crescent wrench.  Mr. Ellis

7     had no money to go to a doctor.

8     Mr. Ellis' truck was vandalized, his tires slashed. Eventually, his car was towed, and he was

9     never able to retrieve it from impound. Due to lack of transportation, Mr. Ellis could not get to work

10
11    and, as a result, lost his job at Protective Coatings.  He was evicted from the apartment and lived on the

12    streets for a period of time before moving to his grandmother's home.

13    Mr. Ellis left his grandparents' home and moved to Maple Valley where his girlfriend lived.

14    While living in Maple Valley, Mr. Ellis was arrested on controlled substances offenses in 2017 and

15    2018. He spent 18 months in jail. He attended and completed CCAP prior to sentencing.

16
17    Mr. Ellis successfully attended and completed a DOSA program for 20 months after his release

18    and worked at United Metals full time. This was the pinnacle of his adult life, and to Mr. Ellis it gives

19    him hope there is a viable future for him. Mr. Ellis generally does very well under direct supervision.

20
21    Mr. Ellis did not miss drugs while in the DOSA program. He admits to one error in judgement

22    during his DOSA attendance. He relapsed on meth. He wrote a 500-word essay. Despite this one

23    admitted misstep, for which he was forthcoming, Mr. Ellis successfully completed his DOSA program.

24    Even while attending CCAP, Mr. Ellis thought ahead about how he would support himself. Mr.

25    Ellis' grandfather, who had retired from Boeing, had taught him the scrap metals business. With this

26
27    knowledge, Mr. Ellis created Gorilla Scrapping, a company that bought and sold scrap metal.

28

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

In 2022, Mr. Ellis registered his current company, Get Rid of It!, LLC, with the Washington Secretary of State. This company, which picked up and disposed of unwanted household and commercial items, was active and insured. Mr. Ellis was building this business up through social media postings and word-of-mouth when he was arrested for this current offense.

### (c.) Mr. Ellis continues to work to improve himself

Mr. Ellis has completed the following classes while in custody: Relapse Prevention, Relaxation, Anxiety and Panic, Relieve Depression, Creating Positive Change, Relieve Stress, Ease Grief, DBT, Choosing My Path: Reflecting on my Relationship with Substances, Anger Management, Criminal Thinking, Anger and Forgiveness, and Alcohol and Other Drugs. Mr. Ellis has also completed the following workbooks while in custody: Faith-based Conflict Management, Getting Started, My Personal Change Plan, Substance Use and Education, The Power of Self-Talk, Managing My Emotions, My Mental Health, My Coping Skills, My Relationships, Managing My Life, Managing My Recovery.

This proactive approach underscores Mr. Ellis' dedication to bettering themselves and preparing for a positive reintegration into society after time is served.

Mr. Ellis has a criminal history that is largely associated with drug usage. Mr. Ellis shows signs and symptomatology associated with ADHD. He has self-medicated in the past, but wishes to explore a formal diagnosis and therapy and treatment. Mr. Ellis has a verified ACES score of 8. He has also been afforded supervision, albeit brief, from a State court sentence, where he did well on supervision. This is the second time Mr. Ellis has been sentenced for a drug offense. He has never been sentenced before a Federal court.

## 3. SIMILAR DEFENDANTS

Mr. Ellis is listed as one of 27 Defendants in this case. The PSI and the Government's Exhibit 1 accurately describe the sentences recommended and received by other members of this conspiracy.

DEFENSE SENTENCING MEMORANDUM

Page 11 of 15

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

The PSI identifies that a sentence similar to co-defendant Eric Smith would avoid unwarranted sentencing disparity. Mr. Smith was sentenced to 144 months of custody, followed by 5 years of supervised release. He was a drug redistributor for Jesse Bailey, a leader of the conspiracy. Mr. Smith had a total offense level of 37 and a criminal history category of VI.

Co-defendant Thomas Carver was also sentenced to 144 months of custody, followed by 5 years of supervised release. Mr. Carver directly partnered with Jesse Bailey, a leader of the conspiracy. Mr. Carver had a total offense level of 43 and a criminal history category of VI.

In comparison, Mr. Ellis' total offense level is 39 with a criminal history category of V. Mr. Ellis was a drug redistributor for Mr. Kilp. The PSI recommends a sentence of 144 months of custody, followed by 5 years of supervised release. To sentence Mr. Ellis to the same sentence as Mr. Carver would not avoid unwarranted sentencing disparity, but to sentence Mr. Ellis to the recommended 132 months as the Defense recommends would be more commiserate with their respective roles. Mr. Carver played a far larger role in the conspiracy when compared to Mr. Ellis.

4. **THE NEED FOR THE SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE**

The Defense recommendation for a 11-year sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Mr. Ellis was forthcoming and cooperative during the presentence interview. He has expressed remorse for his conduct and accepted responsibility for his actions. He has described this in his own words in a letter, attached to this memorandum.

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

5. **THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT**

Mr. Ellis is at a low risk of reoffending if his underlying mental health and substance abuse issues are properly addressed. He is not prone to offenses outside of those that are drug related.

6. **THE NEED FOR THE SENTENCE TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT**

The main thing needed to protect the public from further crimes is strictly monitored probation, therapy, and mental and substance abuse treatment.

7. **THE NEED TO PROVIDE DEFENDANT WITH EDUCATIONAL AND VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER**

Mr. Ellis would like to explore reopening his scrap and junk removal business. It is a trade he knows, and is good at.

Mr. Ellis would like to have access to mental health treatment.

During the PSI it became evident that Mr. Ellis would often trail off, lose focus, or drift from topics. He reports that when he takes Adderall his thinking is clear. The Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist is a widely used screening tool. It was administered on 12/07/2024 and is attached. It is consistent with the behavior displayed in the interview. It supports the diagnosis of ADHD. Mr. Ellis has also suffered severe trauma in his life. It may be that his underlying symptoms are also tied to the abuse he suffered. It is likely that his self-medication and subsequent abuse and addiction is a sad and tragic consequence of untreated mental health and trauma.

**MICHAEL AUSTIN STEWART**
**Attorney at Law, PLLC**
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

### 8. **THE KINDS OF SENTENCES AVAILABLE**

The plea agreement sets forth provisions which do apply in this case but results in an unfair result. Sadly, prison is the only available sentence.

### 9. **THE NEED TO PROVIDE RESTITUTION**

There is no identified restitution in this case.

### 10. **THE MINIMALLY SUFFICIENT SENTENCE IN THIS CASE**

The primary sentencing mandate of section 3553(a) states that courts must impose the minimally-sufficient sentence to achieve the statutory purposes of punishment, justice, deterrence, public protection, and rehabilitation. The Guidelines calculation in this case results in an unfair sentence in light of the above-stated goals.

In consideration of the many reasons discussed above, the Defendant requests that the court sentence him to 132 months imprisonment. Mr. Ellis respectfully requests that the court recommend that he serve his sentence in either Phoenix, Arizona, or El Reno, Oklahoma. If those are not an option, then Sheridan, Oregon so that he is closer to his sister and girlfriend.

Mr. Ellis wants the court to understand he is sincere in his desire to change.

A sentence of 11 years is sufficient to satisfy each factor set forth in the guidelines.

### IV.    **DEFENDANT'S STATEMENT**

Attached is Mr. Ellis' statement to the Court.

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

## V.    MATERIALS IN SUPPORT

Attached hereto are the following materials in support of Mr. Ellis for consideration:

1.  Letter of Support by Ms. Kendra Davis

2.  Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist

Respectfully submitted this 13th day of February, 2025.

MICHAEL AUSTIN STEWART
Attorney for Defendant, WSBA #23981

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date shown below, I e-filed with the Clerk of the Court the foregoing Defense Sentencing Memorandum. I used the CM/ECF system, which will send notification of such filing to all other parties.

DATED this 13th day of February, 2025.

KENDRA PINGUL
Legal Assistant to Attorney Michael A. Stewart
Email: Kendra.Pingul@stewartlawpnw.com

DEFENSE SENTENCING MEMORANDUM

Page 15 of 15

MICHAEL AUSTIN STEWART
Attorney at Law, PLLC
1105 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (253) 383-5346
Fax: (253) 572-9010
StewartLawTacoma@gmail.com

# Shawn Ellis | Statement of Responsibility

Judge Estudillo,

Your honor, I have struggled with drugs off and on for about ten years. In those ten years I have hit some major "rock bottoms", and with those I have made some bad decisions in my life. Some of those decisions led me to be incarcerated now and a couple times before. Please don't let those choices define me as a person your honor. Because with those bad decisions, I have also made ten times as many that were helpful, selfless, inspiring, and responsible. I hope to learn from all the mistakes I have made, especially the one that brings me here in front of you now.

Today I sit in front of you a better person than I was when I was arrested March of 2023. I have been repairing my relationship with my family as well as my girlfriend who has supported me and been there for me as long as I have known her. I am so deeply sorry for the actions that took place to land me here today. I want to take full responsibility for everything I have done, the good and the bad.

The best part of my life in these last ten years is when I was away from the poor life I have chosen, from before when I was working at United Metals and sober with the support of my loved ones. Going down the dark road shutting them out, I went through excessive horrors, with those horrors taking place, I knew it wasn't the life I was meant to be living. Because of all that, I wanted nothing more but to get away from it all and get my life back under control.

I was doing outpatient treatment at Sea-Mar in Monroe Washington and living at a clean and sober house. I was working 58 hours a week, every week I could. I really enjoyed it, and my counselor was great. I did this for two years. I was looking for a house and just put down payment on a new truck, life was at its best. This took place in 2020. In 2021, when everything in my life was stable, I started to get depressed and shut people out. I ended up quitting and using drugs again, and with that, the lifestyle that comes with it.

I really enjoy building my business called "Get Rid of It LLC". I acquired my insurance policy, renewed all my licenses, and then contacted "legal zoom" for help with the legalities for my taxes, etc.  With all that, I was ready to change my life around for the better. I got a storage for my business out of town and was going to contact my old counselor from Sea-Mar to re-enroll into out-patient treatment.

In 2023 I was surrounded by FBI and DEA agents and booked into FDC SeaTac. While I've been in here, I have been programming as much as I could to enhance myself, I have done classes on "relapse prevention", "relaxation", "anxiety and panic", "relieve depression", "anger management", and more. I have also done ten drug treatment workbooks like "my personal change plan", "substance use education", "power of self-talk", etc. and I am not stopping there. I have also done the "Faith Based Conflict Management" workbook. I hope this shows how serious I am

about changing how I think, and how much I regret the decisions I've made to end up in your courtroom today.

Every day when I have a chance, I am helping someone in here. I stay in contact with my beautiful sister and my love Kendra. I am always calling to let them know I care and to make sure they are safe. When you decide my punishment today, I hope you understand that sometimes people actually do change and that I am one of those people. The person I was when I was arrested is long gone and never coming back. I also want you to know that what I have found to motivate my change was found within myself. I have family that loves me, a woman that needs me, and a community that supports me.

I want to say again, say how deeply sorry I am, and I apologize to the court and all those impacted by my actions.


Respectfully,


-Shawn Ellis

To Your Honor:

I am writing this letter in strong support of my boyfriend, Shawn Ellis. I have known Shawn for 11 years and during that time I have come to know him as a caring, compassionate, and selfless person. I want to express my sincere belief in his character and his potential for positive change.

On many occasions Shawn has helped others. I witnessed Shawn's commendable character during a drive when he spotted a woman struggling with her groceries. He not only offered her a ride home but also carried her bags up two flights of stairs. His generosity serves as a powerful reminder of the impact we can have on others' lives through small acts of kindness. On one occasion, Shawn stepped up when a friend's grandmother faced city scrutiny due to her property's overwhelming garbage. Recognizing she couldn't manage the cleanup alone; he dedicated his time and effort to transforming her space. His selfless actions not only led to the revocation of the city fine but also deeply touched the grandmother, who greatly appreciated his thoughtfulness and genuine concern for her wellbeing.

Shawn has provided hope to individuals in difficult times, notably guiding a man who was struggling with despair. He introduced him to his workplace and home, aiming to make a positive impact. Unfortunately, that man has since been diagnosed with a terminal illness and, lacking Shawn's support, has lost his motivation to continue. Additionally, Shawn actively collects non-perishable food items, which I have assisted in distributing to those in need. He is known for his forgiveness and compassion, always ready to listen to others' problems. Following the tragic loss of a close friend who took his own life, Shawn was a vital source of emotional support for me, reassuring me that I was not to blame and aiding me in my healing process.

I would also like to mention Shawn's deep love and responsibility towards his dog, Karma. Karma is very social and loves people and is important to Shawn. While Shawn is away, I have been caring for Karma, but I know Shawn is concerned about her well-being. This demonstrates his capacity for love and responsibility towards others.

I am also aware of Shawn's dedication to his business "Get Rid of It LLC". It is an eco-friendly company focused on junk removal. He has worked diligently to build this business and it has the potential to provide jobs and contribute positively to the community.

Shawn exemplifies resilience; he doesn't allow challenges to keep him down for long and consistently maintains hope for a brighter future. Throughout his life, he has made every effort to correct past mistakes, and while I may not be in a position to pass judgment, I genuinely believe that a lengthy prison sentence is not warranted for him. Shawn is a

generous, determined, and hardworking individual who embodies the best qualities of an American citizen. A long-term incarceration would not only tarnish his character but could also negatively impact those around him. If there is any possibility for a lesser sentence or alternative forms of punishment, I urge you to consider it. Shawn is not someone who instills fear; rather, he is a guiding light, respected and loved by many.

Sincerely,

Kendra Davis

2/12/2025

# The Value of Screening for Adults With ADHD

Research suggests that the symptoms of ADHD can persist into adulthood, having a significant impact on the relationships, careers, and even the personal safety of your patients who may suffer from it.[1-4] Because this disorder is often misunderstood, many people who have it do not receive appropriate treatment and, as a result, may never reach their full potential. Part of the problem is that it can be difficult to diagnose, particularly in adults.

The Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist was developed in conjunction with the World Health Organization (WHO), and the Workgroup on Adult ADHD that included the following team of psychiatrists and researchers:

- **Lenard Adler, MD**
  Associate Professor of Psychiatry and Neurology
  New York University Medical School

- **Ronald C. Kessler, PhD**
  Professor, Department of Health Care Policy
  Harvard Medical School

- **Thomas Spencer, MD**
  Associate Professor of Psychiatry
  Harvard Medical School

As a healthcare professional, you can use the ASRS v1.1 as a tool to help screen for ADHD in adult patients. Insights gained through this screening may suggest the need for a more in-depth clinician interview. The questions in the ASRS v1.1 are consistent with DSM-IV criteria and address the manifestations of ADHD symptoms in adults. Content of the questionnaire also reflects the importance that DSM-IV places on symptoms, impairments, and history for a correct diagnosis.[4]

The checklist takes about 5 minutes to complete and can provide information that is critical to supplement the diagnostic process.

References:
1. Schweitzer JB, et al. Med Clin North Am. 2001;85(3):10-11, 757-777.
2. Barkley RA. Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and Treatment. 2nd ed. 1998.
3. Biederman J, et al. Am J Psychiatry.1993;150:1792-1798.
4. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association. 2000: 85-93.

ASRS v1.1 Scoring update

Posted: February 28, 2024

The original ASRS-V1.1 Screener dichotomous scoring rule, assigned 1 point for items scored above a certain threshold to create a 0-6 scale with a cutpoint of 4 or more to screen positive for ADHD. However, the prevalence estimates for ADHD were high/inconsistent. The 0-6 scoring rules were originally created to make it easier for primary care/clinical use. But, as described in the paper "Kessler, R.C., Adler, L.A., Gruber, M.J., Sarawate, C.A., Spencer, T., Van Brunt, D.L. (2007). Validity of the World Health Organization Adult ADHD Self-Report Scale (ASRS) Screener in a representative sample of health plan members. International Journal of Methods in Psychiatric Research 16(2), 52-65" an alternative 0-24 scale scoring method was found to be more robust and better for research purposes/when studying prevalence and correlates of ADHD compared to the 0-6 scoring system. This alternative system assigns 0 points for a response of "never," 1 point for "rarely," 2 points for "sometimes," 3 points of "often," and 4 points for a response of "very often" to each question. The points are summed for a range of 0-24, with a cutpoint of 14 or more to screen positive for ADHD. The total score can be classified in four-stratum: 0-9=low negative, 10-13=high negative, 14-17=low positive range, and 18-24=high positive range.

**Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist**

Description:
The Symptom Checklist is an instrument consisting of the eighteen DSM-IV TR criteria. Six of the eighteen questions were found to be the most predictive of symptoms consistent with ADHD. These six questions are the basis for the ASRS v1.1 Screener and are also Part A of the Symptom Checklist. Part B of the Symptom Checklist contains the remaining twelve questions.

Scoring and Interpretation:
If four or more marks appear in the darkly shaded boxes within Part A then the patient has symptoms highly consistent with ADHD in adults and further investigation is warranted. The frequency scores on Part B provide additional cues and can serve as further probes into the patient's symptoms. Pay particular attention to marks appearing in the dark shaded boxes. The frequency-based response is more sensitive with certain questions. No total score or diagnostic likelihood is utilized for the twelve questions. It has been found that the six questions in Part A are the most predictive of the disorder and are best for use as a screening instrument.

References:
- Schweitzer JB, Cummins TK, Kant CA. Attention-deficit/hyperactivity disorder. *The Medical clinics of North America.* May 2001;85(3):757-777. PMID: 11349483
- Barkley RA. Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and Treatment. 2nd ed. 1998.
- Biederman J, Faraone SV, Spencer T, et al. Patterns of psychiatric comorbidity, cognition, and psychosocial functioning in adults with attention deficit hyperactivity disorder. The American journal of psychiatry. Dec 1993;150(12):1792-1798. PMID: 8238632
- American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association. 2000: 85-93.
- Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist. Available at: http://www.hcp.med.harvard.edu/ncs/ftpdir/adhd/18%20Question%20ADHD-ASRS-v1-1.pdf Accessed March 15, 2012.

# Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist

| Patient Name | | Today's Date | | | | | |

| Please answer the questions below, rating yourself on each of the criteria shown using the scale on the right side of the page. As you answer each question, place an X in the box that best describes how you have felt and conducted yourself over the past 6 months. Please give this completed checklist to your healthcare professional to discuss during today's appointment. | Never | Rarely | Sometimes | Often | Very Often |
|---|---|---|---|---|---|
| 1. How often do you have trouble wrapping up the final details of a project, once the challenging parts have been done? | | | X | X | |
| 2. How often do you have difficulty getting things in order when you have to do a task that requires organization? | | | X | | |
| 3. How often do you have problems remembering appointments or obligations? | | | | | X |
| 4. When you have a task that requires a lot of thought, how often do you avoid or delay getting started? | | | | X | |
| 5. How often do you fidget or squirm with your hands or feet when you have to sit down for a long time? | | | | | X |
| 6. How often do you feel overly active and compelled to do things, like you were driven by a motor? | | | | | X |
| | | | | | Part A |

| | Never | Rarely | Sometimes | Often | Very Often |
|---|---|---|---|---|---|
| 7. How often do you make careless mistakes when you have to work on a boring or difficult project? | | | | X | |
| 8. How often do you have difficulty keeping your attention when you are doing boring or repetitive work? | | | | | X |
| 9. How often do you have difficulty concentrating on what people say to you, even when they are speaking to you directly? | | | | | X |
| 10. How often do you misplace or have difficulty finding things at home or at work? | | | | X | |
| 11. How often are you distracted by activity or noise around you? | | | | | X |
| 12. How often do you leave your seat in meetings or other situations in which you are expected to remain seated? | | | | X | |
| 13. How often do you feel restless or fidgety? | | | | | X |
| 14. How often do you have difficulty unwinding and relaxing when you have time to yourself? | | | | | X |
| 15. How often do you find yourself talking too much when you are in social situations? | | | | | X |
| 16. When you're in a conversation, how often do you find yourself finishing the sentences of the people you are talking to, before they can finish them themselves? | | | X | | |
| 17. How often do you have difficulty waiting your turn in situations when turn taking is required? | | | X | X | |
| 18. How often do you interrupt others when they are busy? | | | X | | |
| | | | | | Part B |

# Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist Instructions

*The questions on the back page are designed to stimulate dialogue between you and your patients and to help confirm if they may be suffering from the symptoms of attention-deficit/hyperactivity disorder (ADHD).*

Description: The Symptom Checklist is an instrument consisting of the eighteen DSM-IV-TR criteria. Six of the eighteen questions were found to be the most predictive of symptoms consistent with ADHD. These six questions are the basis for the ASRS v1.1 Screener and are also Part A of the Symptom Checklist. Part B of the Symptom Checklist contains the remaining twelve questions.

## Instructions:

### Symptoms

1. Ask the patient to complete both Part A and Part B of the Symptom Checklist by marking an X in the box that most closely represents the frequency of occurrence of each of the symptoms.
*To read instructions on page.*

2. Score Part A. If four or more marks appear in the darkly shaded boxes within Part A then the patient has symptoms highly consistent with ADHD in adults and further investigation is warranted.

3. The frequency scores on Part B provide additional cues and can serve as further probes into the patient's symptoms. Pay particular attention to marks appearing in the dark shaded boxes. The frequency-based response is more sensitive with certain questions. No total score or diagnostic likelihood is utilized for the twelve questions. It has been found that the six questions in Part A are the most predictive of the disorder and are best for use as a screening instrument.

### Impairments

1. Review the entire Symptom Checklist with your patients and evaluate the level of impairment associated with the symptom.

2. Consider work/school, social and family settings.

3. Symptom frequency is often associated with symptom severity, therefore the Symptom Checklist may also aid in the assessment of impairments. If your patients have frequent symptoms, you may want to ask them to describe how these problems have affected the ability to work, take care of things at home, or get along with other people such as their spouse/significant other.

### History

1. Assess the presence of these symptoms or similar symptoms in childhood. Adults who have ADHD need not have been formally diagnosed in childhood. In evaluating a patient's history, look for evidence of early-appearing and long-standing problems with attention or self-control. Some significant symptoms should have been present in childhood, but full symptomology is not necessary.